# APPEAL NO.: 23-13430-F

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

_____

UNITED STATES OF AMERICA,
PLAINTIFF-APPELLEE,

v.

EMORY AUSTIN CARTER,
DEFENDANT-APPELLANT.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION
CASE NO.: 7:22-CR-00058-HL-TQL-1

_____

## Appellant's Initial Brief

_____

Jonathan Dodson
Assistant Federal Defender
Federal Defenders of the
Middle District of Georgia, Inc.
440 Martin Luther King, Jr. Boulevard, Suite 400
Macon, Georgia 31201
Tel: (478) 743-4747
Fax: (478) 207-3419
E-mail: jonathan_dodson@fd.org
Appellate Counsel for Carter

*U.S. v. Carter*, 23-13430

**Appellant's Certificate of Interested Persons and Corporate Disclosure Statement**

The undersigned appellate counsel of record for Appellant, Emory Austin Carter, in compliance with Fed. R. App. P. 26.1 and 11th Cir. R. 26.1-1, certifies that the following listed persons and parties have an interest in the outcome of this case:

**Carter, Emory Austin**, Defendant-Appellant;

**Conway, Byron L., Jr.**, Executive Director for the Federal Defenders of the Middle District of Georgia, Inc.;

**Couch, Hannah**, Assistant United States Attorney, Middle District of Georgia;

**Dodson, Jonathan**, Appellate Attorney for Defendant-Appellant, Mr. Carter, Assistant Federal Defender for the Federal Defenders of the Middle District of Georgia, Inc.;

**Gabriel, Russell C.**, Former Interim Executive Director for the Federal Defenders of the Middle District of Georgia, Inc.;

**Langstaff, Thomas Q.**, United States Magistrate Judge, Middle District of Georgia;

**Lawson, Hugh**, District Court Judge, United States District Court, Middle District of Georgia;

**Leary, Peter D.**, United States Attorney, Middle District of Georgia;

*U.S. v. Carter*, 23-13430

**McClary, Danisha L.**, Trial Attorney for Defendant-Appellant, Mr. Carter, Assistant

Federal Defender for the Federal Defenders of the Middle District of Georgia;

**Simpkins, Michael N.**, Trial Attorney for Defendant-Appellant, Mr. Carter, Assistant

Federal Defender for the Federal Defenders of the Middle District of Georgia;

**Walker, Stuart**, Assistant United States Attorney, Middle District of Georgia;

**Victims:** There are no identifiable victims in this case.; and,

No publicly traded company or corporation has an interest in the outcome of this

appeal.

**Statement Regarding Oral Argument**

Carter requests oral argument, which would be helpful to the panel in resolving the issues presented by this case.

## Table of Contents

APPELLANT'S CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT .......................................................................... C1 of 2

STATEMENT REGARDING ORAL ARGUMENT ........................................................... i

TABLE OF CONTENTS ............................................................................................... ii

TABLE OF AUTHORITIES .......................................................................................... v

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION ....................... 1

STATEMENT OF THE ISSUES ..................................................................................... 2

STATEMENT OF THE CASE ........................................................................................ 3

I.    PROCEDURE, FACTS AND DISPOSITION ........................................................... 3

      A.    Pleadings and Sentences.................................................................... 3

      B.    Offense Conduct ................................................................................ 3

      C.    Explanation of Offense at Change of Plea Hearing ............................ 4

      D.    Guidelines Calculations ..................................................................... 4

      E.    Objection to Chapter Four Enhancements ........................................ 7

II.   STANDARDS AND SCOPES OF REVIEW ........................................................... 11

SUMMARY OF ARGUMENT ..................................................................................... 13

ARGUMENT............................................................................................................. 17

I.    THE DISTRICT COURT PLAINLY ERRED BY FINDING THAT CARTER'S TWO GEORGIA COCAINE-RELATED CONVICTIONS QUALIFIED AS "SERIOUS DRUG OFFENSES" WITHIN THE MEANING OF 18 U.S.C. § 922(e)(1), BECAUSE THEY INVOLVED A DEFINITION OF COCAINE THAT IS BROADER THAN THE FEDERAL DEFINITION. ............................................................................................. 18

A. Conformational Isomers ................................................... 19

B. Ioflupane ......................................................................... 23

II. THE DISTRICT COURT ERRED IN FINDING CARTER'S COCAINE-RELATED CONVICTIONS QUALIFED AS "CONTROLLED SUBSTANCE OFFENSES," BECAUSE TO QUALIFY AS A "CONTROLED SUBSTANCE" UNDER GA. CODE ANN. § 16-13-21, A DRUG MUST APPEAR ON BOTH THE GEORGIA AND FEDERAL CONTROLLED SUBSTANCE SCHEDULES, AND THE GEORGIA SCHEDULE DEFINES COCAINE MORE BROADLY THAN THE FEDERAL SCHEDULE. ................................................................................. 27

III. IN *NEW YORK STATE RIFLE & PISTOL ASS'N, INC. V. BRUEN*, 597 U.S. 1 (2022), THE SUPREME COURT ESTABLISHED A TEST FOR WHETHER A LAW VIOLATES THE SECOND AMENDENT: IF THE TEXT OF THE AMENDMENT COVERS THE CONDUCT THAT THE LAW PROSCRIBES, THE GOVERNMENT MUST SHOW THE LAW IS CONSISTENT WITH DISTINCTLY SIMILAR LAWS OR REGULATIONS THAT WERE COMMONPLACE AROUND THE TIME THE SECOND AMENDMENT WAS ADOPTED. UNDER THIS FRAMEWORK, 18 U.S.C. § 922(g)(1) IS FACIALLY UNCONSTITUTIONAL, AND CARTER'S CONVICTION CANNOT STAND. ........................................................ 30

A. Dicta in *Heller* and *Bruen.* ............................................... 32

B. *Bruen* abrogated *Rozier*. .................................................. 33

C. The plain text of the Second Amendment covers the conduct proscribed by 18 U.S.C. §§ 922(g)(1) and 924(a)(2). ......................... 37

D. Barring all felons from possessing firearms is inconsistent with the relevant historical tradition of firearms regulations. ................. 40

i. The vast majority of the government's precedents did not exist around the time the Second Amendment was ratified, which disqualifies them under *Bruen*. ......................................... 45

ii. A handful of distinctly similar laws would not establish an historical "tradition" according to *Bruen*. ......................... 47

    iii.   The Second Amendment and its predecessor in the Declaration of Rights of Man were adopted precisely to counter categorical disarmament laws ............................................................................... 49

    iv.   Unratified drafts of the Second Amendment suggest that the Framers *rejected* those limitations on the Second Amendment. ..... 51

IV.  EVEN IF § 922(g)(1) CAN CONSTITUTIONALLY APPLY UNDER SOME CIRCUMSTANCES, IT IS UNCONSTITUTIONAL AS APPLIED TO CARTER. .......... 52

CONCLUSION .................................................................................................. 54

CERTIFICATE OF COMPLIANCE ............................................................... 55

CERTIFICATE OF SERVICE ......................................................................... 56

## Table of Authorities

### Cases

*Begay v. United States*,
    553 U.S. 137 (2008) ........................................................................... 34

C.*W. v. Dep't of Human Services*,
    353 Fa. App. 360 (2019)................................................................... 28

*Chamu v. United States*,
    24 F.4th 1325 (11th Cir. 2022) ........................................................ 9

*Class v. United States*,
    __U.S.__, 138 S.Ct. 798 (2018)................................................ 11, 15

*Folajtar v. Attorney General*,
    980 F.3d 897 (3rd Cir. 2020) ........................................................ 46

*Garrett v. University of Alabama at Birmingham Bd. of Trustees*,
    344 F.3d 1288 (11th Cir. 2003) ..................................................... 34

*Kanter v. Barr*,
    919 F.3d 437 (7th Cir. 2019) (Barrett, J., dissenting)........................ 48

*McCoy v. United States*,
    266 F.3d 1245 (11th Cir. 2001) ..................................................... 11

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) ..................................................................... 32

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    597 U.S. 1 (2022) ........................................................... 2, 15, 17, 30

*Range v. Attorney General*,
    69 F.4th 96 (3d Cir. 2023) ........................................................ 32, 53

*Rehaif v. United States*,
    __U.S.__, 139 S.Ct. 2191 (2019)................................................. 52

*Silvester v. Becerra*, __U.S.__,
    138 S.Ct. 945 (2018) (Thomas, J., dissenting from cert. denial) ........ 35

*Sprint Communications Co., L.P. v. APCC Services, Inc.*,
    554 U.S. 269 (2008) (Roberts, C. J., dissenting) ................................................. 46

*State v. Roundtree*,
    952 N.W.2d 765 (Wis. 2021) (Bradley, J., dissenting) ....................................... 40

*United Sates v. Jackson*,
    36 F.4th 1294 (2022), *vacated by Jackson*, 55 F.4th 856 ................................ 25

*United State v. Dubois*,
    No. 22-10829, __F.4th__, 2024 WL 927030 (11th Cir. Mar. 5, 2024) ......... *passim*

*United States v. Archer*,
    531 F.3d 1347 (11th Cir. 2008) ................................................................ 34, 35

*United States v. Bishop*,
    940 F.3d 1242 (11th Cir. 2019) ........................................................................ 11

*United States v. Booker*,
    644 F.3d 12 (1st Cir. 2011) ............................................................................... 46

*United States v. Dawson*,
    64 F.4th 1227 (11th Cir. 2023) ........................................................................ 11

*United States v. Files*,
    63 F.4th 920 (11th Cir. 2023) .......................................................................... 36

*United States v. Gilbert*,
    138 F.3d 1371 (1998) ....................................................................................... 34

*United States v. Jackson*,
    55 F.4th 846 (11th Cir. 2022), *cert. granted*, 143 S.Ct. 2457 (2023) ........... *passim*

*United States v. Oliver*,
    987 F.3d 794 (8th Cir. 2021) ........................................................................... 21

*United States v. Penn*,
    63 F.4th 1305 (11th Cir. 2023) ........................................................................ 11

*United States v. Quailes*,
  No. 1:21-CR-00176, __F.Supp.3d__, 2023 WL 5401733 (M.D. Pa. Aug. 22, 2023)
  ................................................................................................. 53

*United States v. Quiroz*,
  629 F.Supp.2d 3d 511 (W.D. Tex. 2022).......................................... 47

*United States v. Raines*,
  362 U.S. 17 (1960) ........................................................................ 33

*United States v. Rozier*,
  598 F.3d 768 (11th Cir. 2010) .................................................... *passim*

*United States v. Skoien*,
  614 F.3d 638 (7th Cir. 2010) ......................................................... 46

*United States v. Tribble*,
  No. 2:22-CR-85, 2023 WL 2455978 (N.D. Ind. Mar. 10, 2023) .......................... 32

## Statutes

18 U.S.C.
  § 3231 ............................................................................................ 1
  § 922(g)(1)................................................................................ *passim*
  § 924(a)(2)................................................................................ *passim*
  § 924(e)(1).................................................................................1, 4

21 U.S.C.
  § 802(6) .....................................................................................8, 19
  § 812(c) sched. II(a)(4) ..............................................................19, 24

28 U.S.C.
  § 1291 ........................................................................................... 1

Ga. Code Ann.
  § 16-13-21 .................................................................................. *passim*
  § 16-13-26(1)(D) .......................................................................8, 19, 24

**Other Authorities**

"conformational isomerism," Wikipedia, available at:
https://en.wikipedia.org/wiki/Conformational_isomerism ............................. 20

"pistol," Wikipedia, https://en.wikipedia.org/wiki/Pistol (last visited Jan. 19, 2024)
........................................................................................................................ 38

1 W. & M., Sess. 2, ch. 2 (1689) ............................................................................ 50

Bob Ruppert, "The Rattlesnake Tells the Story," Journal of the American
Revolution (Jan. 2015) ....................................................................................... 42

Br. Amici Curiae of Alabama, Florida, and Georgia in support of rehearing,
*Jackson*, 2022 WL 2593324 (11th Cir. Jul. 1, 2022) ........................................... 25

C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?,* 32 HARV. J. L. & PUB.
POL'Y 695, 711 (2009) ....................................................................................... 48

Carlton F.W.Larson, *Four Exceptions in Search of a Theory: District of Columbia v.
Heller and Judicial Ipse Dixit*, 60 Hastings L. J. 1371 (2009) ............................... 48

Cis-trans isomer," International Union of Pure and Applied Chemistry
Compendium of Chemical Terminology ("Gold Book") (available at:
https://goldbook.iupac.org/terms/view/E02069) ........................................... 20

David E. Vandercoy, *The History of the Second Amendment*, 28 Val. U. L. Rev.
1007, 1015 (1994) .............................................................................................. 49

Encyclopedia of Virginia, *Convict Labor During the Colonial Period*, available at:
https://encyclopediavirginia.org/entries/convict-labor-during-the-colonial-
period/ (last visited August 15, 2023) ................................................................ 41

Gov't Br., *United States v. Deonta Lowe*, No. 22-13251, 40-41 (11th Cir. Apr. 6,
2023) ................................................................................................................... 36

Hold Memo of Solicitor General, *Shearry v. United States*, ___S.Ct.___, 2023 WL
3194903 (2023) (No. 22-7894) (Aug. 30, 2023) .................................................. 26

Noah Webster, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) ................ 39

OXFORD ENG. DICT, Available at:
https://www.oed.com/view/Entry/55681?redirectedFrom=distinctly#eid (last viewed Aug. 25, 2023) ...................................................................................... 42

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*: The Legal Context of the Second Amendment, 25 L. & HIST. REV. 139, 157 (2007) ............................................ 48

THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, 450 (5th ed. 2022) ....... 19

Thomas Dyche & William Pardon, A NEW GENERAL ENGLISH DICTIONARY (14th ed. 1771) ............................................................................................. 38

Wikipedia, available at: https://en.wikipedia.org/wiki/Ecgonine ......................... 25

## Rules

11th Cir. R. 26.1-1 ................................................................ C1

11th Cir. R. 32-4 ................................................................... 55

Fed. R. App. P. 26.1 ............................................................. C1

Fed. R. App. P. 32 ................................................................. 55

## Regulations

21 C.F.R. § 1308.12 ............................................................. 25

80 Fed. Reg. 54716 .............................................................. 25

## Constitutional Provisions

U.S. CONST., 2D AMEND .................................................... *passim*

## United States Sentencing Guidelines

U.S.S.G.
§2K2.1(a)(2) ........................................................... 4, 14, 27
§4A1.1(d) ...................................................................... 6
§4B1.2(b)(1) ......................................................... *passim*
§4B1.4(a) ....................................................................... 5

## Statement of Subject Matter and Appellate Jurisdiction

This is a direct appeal in a criminal case from the September 20, 2023, judgment convicting Carter of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 924(e)(1), and sentencing him to an 210-month term of imprisonment. R50 (judgment) at 2. The District Court had jurisdiction under 18 U.S.C. § 3231. Carter timely noticed an appeal on September 26, 2023. R54. This Court has jurisdiction under 28 U.S.C. § 1291.

## Statement of the Issues

I.   THE DISTRICT COURT PLAINLY ERRED BY FINDING THAT CARTER'S TWO GEORGIA COCAINE-RELATED CONVICTIONS QUALIFIED AS "SERIOUS DRUG OFFENSES" WITHIN THE MEANING OF 18 U.S.C. § 922(e)(1), BECAUSE THEY INVOLVED A DEFINITION OF COCAINE THAT IS BROADER THAN THE FEDERAL DEFINITION.

II.  THE DISTRICT COURT ERRED IN FINDING CARTER'S COCAINE-RELATED CONVICTIONS QUALIFED AS "CONTROLLED SUBSTANCE OFFENSES," BECAUSE TO QUALIFY AS A "CONTROLED SUBSTANCE" UNDER GA. CODE ANN. § 16-13-21, A DRUG MUST APPEAR ON BOTH THE GEORGIA AND FEDERAL CONTROLLED SUBSTANCE SCHEDULES, AND THE GEORGIA SCHEDULE DEFINES COCAINE MORE BROADLY THAN THE FEDERAL SCHEDULE.

III. IN *NEW YORK STATE RIFLE & PISTOL ASS'N, INC. V. BRUEN*, 597 U.S. 1 (2022), THE SUPREME COURT ESTABLISHED A TEST FOR WHETHER A LAW VIOLATES THE SECOND AMENDENT: IF THE TEXT OF THE AMENDMENT COVERS THE PROSCRIBED CONDUCT, THE GOVERNMENT MUST SHOW IT IS CONSISTENT WITH DISTINCTLY SIMILAR LAWS OR REGULATIONS THAT WERE COMMONPLACE AROUND THE TIME THE SECOND AMENDMENT WAS ADOPTED. UNDER THIS FRAMEWORK, 18 U.S.C. § 922(g)(1) IS FACIALLY UNCONSTITUTIONAL, AND CARTER'S CONVICTION CANNOT STAND.

IV.  EVEN IF § 922(g)(1) CAN CONSTITUTIONALLY APPLY UNDER SOME CIRCUMSTANCES, IT IS UNCONSTITUTIONAL AS APPLIED TO CARTER.

**Statement of the Case**

**I.    Procedure, Facts and Disposition**

A.  Pleadings and Sentences

A grand jury charged Carter with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and with having four convictions of "serious drug offenses" – for sale of cocaine in Lowndes County on October 8, 2005; for the same in Lowndes County on December 14, 2012; for the same in Lowndes County on December 21, 2012; and for possessing with intent to sell cocaine in Lowndes County on January 21, 2016. R1 (indictment) at 1. He pleaded guilty without a plea agreement. R24 (plea sheet); R43 (change of plea transcript). Probation calculated the imprisonment range advised by his Guidelines to be 180 to 210 months, based on a total offense level of 30 and a criminal history category of VI. R31 (final PSR) at 18. The District Court sentenced him to a 210-month term of imprisonment. R50 (judgment) at 2.

B.  Offense Conduct

Officers observed Carter walking in a residential area of Valdosta. R31 at 3. Knowing he had probation violation warrants, they approached him. *Id*. He ran and they gave chase. *Id*. They caught him, detained him, and found a loaded pistol in his waistband. *Id*. He admitted he had run because he had the firearm. *Id*.

### C. Explanation of Offense at Change of Plea Hearing

The District Court read Carter's indictment to him:

> And Count One specifically charges that on or about September 22nd, 2021, in the Valdosta Division of the Middle District of Georgia and elsewhere within the jurisdiction of this Court, you, Emory Austin Carter, knowing that you had been convicted of a crime punishable by imprisonment for a term exceeding one year, did knowingly possess a firearm – to-wit: one Lorcin Model L9, 9-millimeter pistol, Serial Number L079307 – said firearm having been shipped and transported in interstate and foreign commerce, all in violation of Title 18, United States Code, Sections 922(g)(1) and 924(e)(1).

R43 at 3:6-15. It stated "[b]efore you committed the offense charged in this count, you had four previous serious drug convictions or offenses committed on occasions different from one another[.]" *Id.* at 3:17-18. It then recounted the four convictions stated above. *Id.* at 3:19 – 4:4. The government then explained his minimum and maximum imprisonment terms, which was 15 years to life. *Id.* at 4:9-10.

### D. Guidelines Calculations

In the presentence investigation report that the court ultimately adopted, probation advised that Mr. Carter's base offense level would be 24 under U.S.S.G. §2K2.1(a)(2) based on his committing the offense after two felony convictions for controlled substance offenses. R31 at 4. It cited his 2006 sale of cocaine conviction and his 2016 conviction for possessing with intent to sell

4

cocaine. *Id*. It recommended, however, that his sentence be enhanced under U.S.S.G. §4B1.4(a), because he qualified as an Armed Career Criminal, based on at least three prior convictions for serious drug offenses. *Id*. at 4-5. It cited the same two convictions that it used to determine his base offense level, along with two more sale of cocaine convictions – one in 2006 and another in 2013. *Id*. at 4. This made his offense level 33. *Id*. Subtracting three levels for timely acceptance of responsibility made his total offense level 30.

The PSR detailed Carter's criminal history. At age 18, he was convicted of simple assault, simple battery, and obstructing an officer. R31 at 6. At 19, he was convicted of driving without a license and speeding. *Id*. At 23, he was convicted of giving a false name to the police. *Id*. at 7. At 25, he was convicted of possessing marijuana and three counts of interfering with police. *Id*. At 26, he was convicted of possessing cocaine. *Id*. at 8. None of the above convictions scored criminal history points. *Id*. at 6-8.

At 29 years old he was sentenced to a 6-year prison term for possessing cocaine. *Id*. at 8. This scored three criminal history points since he ultimately served over a year. *Id*. At age 30, he was convicted of two counts of sale of cocaine, for which he was sentenced to 10 years of imprisonment. *Id*. at 9. As he ultimately served over a year of these terms, the first count scored three criminal history

points. At age 35, he was convicted of driving without a valid license and disregarding a traffic control device. *Id*. at 10. At age 37, he was convicted of driving without a valid license and defective brake lights. *Id*. He was also convicted again of selling cocaine, for which he received a 20-year prison term. *Id*. As he served over a year, this scored another 3 criminal history points. *Id*.

At age 40, he was convicted of possessing with intent to sell cocaine, and received a probationary term. *Id*. at 11. Based on his revocation sentence, he scored two criminal history points. *Id*. At age 44, he was convicted of driving without a valid license and failing to yield the right of way, and served 60 days in jail for these offenses, for which he scored two criminal history points. *Id*. at 12. In another case that year, he received probation for driving with an expired tag and driving with a suspended license. *Id*. This also scored two criminal history points. *Id*. Finally, at 45 years old, he was convicted of possessing cocaine. *Id*. at 13. He was sentenced to imprisonment for 8 years, but only served 4 months, before his probation was revoked. *Id*. Probation recommended he scored 3 points based on his subsequent revocation sentence. *Id*. Because he was on probation for a number of his more recent felony offenses when he possessed the firearm in this case, he scored two criminal history points under U.S.S.G. §4A1.1(d).

6

This totaled 20 criminal history points, which qualifies as a category VI criminal history. *Id*. at 14. Based on an offense level of 30 and criminal history category of VI, the Guidelines advised an imprisonment range of 180 to 210 months. *Id*.

E. Objection to Chapter Four Enhancements

Mr. Carter objected to his chapter four enhancement. R29. He argued that his cocaine convictions did not qualify as "controlled substance offenses" because Georgia defined cocaine in two overly broad ways. *Id*. at 2-3. First, Georgia's definition includes ioflupane, but the federal definition excepts it. *Id*. at 2. And second, Georgia's definition "includes certain 'isomers' that the federal definition does not." *Id*. He acknowledged that *United States v. Jackson*, 55 F.4th 846 (11th Cir. 2022), *cert. granted*, 143 S.Ct. 2457 (2023), bound the District Court to compare the Georgia definition to the federal definition that was effective on the dates of his prior convictions, but maintained that *Jackson* wrongly decided that point, noting the pending review of the case by the Supreme Court. R29 at 3.

Mr. Carter then quoted the relevant definitions. *Id*. at 3-4. He argued that both definitions on their face included cocaine derivatives, and that ioflupane was a cocaine derivative. *Id*. at 4. He then noted that this Court had recognized in *Jackson* that the federal government had excepted ioflupane from its definition in

7

2015. *Id*. In this way, his convictions were based on a cocaine definition that was overbroad. *Id*.

As to its isomers, he pointed out that "[t]he federal definition of cocaine includes 'optical and geometric isomers,' 21 U.S.C. § 802(6), while Georgia's definition includes all 'stereoisomers of cocaine.' Ga. Code Ann. § 16-13-26(1)(D)." *Id*. at 5. He defined these types of isomers, and then posited another type of stereoisomer called conformational isomers. *Id*. at 5-6. He noted that these types of isomers were "very common," and "well-studied" and that "[c]ocaine often comes with adulterants, dilutants and impurities, each of which can lead to conformational isomers." *Id*. at 6. In support of his argument, he attached the declaration and curriculum vitae of an expert chemist, UCLA Professor Neil Garg. *Id*. at 29-1, 29-2. This declaration defined the relevant types of isomers in more detail, using examples and diagrams. R29-2 at 2-6. It cited a "seminal study" that "evaluated various conformational isomers of cocaine and studied their relative energies." *Id*. at 4-5.

Because Georgia's definition of cocaine included a real-life, and common, type of stereoisomer that the federal definition does not, it was overbroad in this additional way. Both overbreadths disqualified Mr. Carter's Georgia cocaine convictions as "serious drug offenses" and "controlled substance offenses."

In its written response, the government contended that Mr. Carter "failed to demonstrate a 'reasonable probability' that his statute of convictions is impermissibly overbroad compared to federal law under the categorical approach[.]" R32 at 1. It argued:

> [s]ection 16-13-26(D) has never encompassed ioflupane because it has never identified ecgonine (ioflupane's immediate progenitor) alongside cocaine as a principal substance and, as a result, has never purported to reach derivatives of ecgonine (unlike derivatives of cocaine). Neither has Georgia's statute ever purported to (or needed to) exclude ioflupane from its reach.

*Id*. at 2. As to ioflupane, it characterized Garg's declaration testimony "as an apparent attempt to overcome the evidentiary shortfall reflected by the exert witness in *Chamu*[*v. United States*, 24 F.4th 1325 (11th Cir. 2022).] It assumed that his declaration established the "mere metaphysical existence of non-optical and non-geometric stereoisomers of cocaine," unlike Chamu's expert. *Id*. at 5. But it argued he could not establish conformational isomers " 'exist in quantities required for an offender to be prosecuted for possessing them[.]' " *Id*. at 6 (quoting *Chamu*, 24 F.4th at 1331). Because Carter did not identify any case in which a defendant was prosecuted for conformational isomers by the state of Georgia, it argued he had not show a "realistic probability" that it would do so. *Id*. (quoting *Chamu*, 24 F.4th at 1330).

9

At sentencing, Mr. Carter rested on his motion, although he framed he claimed his cocaine offenses did not qualify as serious drug offenses. R44 at 4:2-9. The government argued he had pleaded guilty to the indictment and, in doing so, agreed that his Georgia cocaine offenses were predicates. *Id*. at 4:12-17. It then argued that Georgia's cocaine definition had never included ioflupane. *Id*. at 4:18-23. As to isomers, it acknowledged that "Georgia['s] definition of cocaine has – includes all isomers essentially, and the federal definition is a bit more specific," but it noted that no court had ever found Georgia's definition was overbroad on this ground. *Id*. at 4:23 – 5:4.

The court questioned whether defense counsel truly understood the Professor Garg's declaration. R44 at 6:12-19. Defense counsel pointed to the declaration's description of various isomers, and said "I don't know what isomers are, but I do know that that means that one is broader than the other. And if that's the case, then that means that the Georgia definition is broader than the federal definition." *Id*. at 6:20 – 7:7. The court overruled the objection. *Id*. at 7:13. Subsequently, after the court pronounced the defendant's sentence, counsel objected "to the substantive and procedural reasonableness of the sentence[.]" *Id*. at 14:5-7.

## II.    Standards and Scopes of Review

This Court "review[s] *de novo* a district court's determination that a prior conviction is a 'serious drug offense' under ACCA." *United States v. Penn*, 63 F.4th 1305, 1309 (11th Cir. 2023). Likewise, it reviews *de novo* "whether a firearm defendant's prior conviction qualifies as a 'controlled substance offense' under the Sentencing Guidelines." *United States v. Bishop*, 940 F.3d 1242, 1253 (11th Cir. 2019).

Plain error does not apply to purely legal questions like these. *United States v. Dawson*, 64 F.4th 1227, 1239 (11th Cir. 2023) (holding "the government's contention that plain-error review applies is unavailing[]" because " 'parties cannot waive the application of the correct law or stipulate to an incorrect legal test.' ") (citation omitted.) Moreover, the defendant could not waive his ACCA objection by pleading guilty, because the Court did not have jurisdiction to sentence him in excess of his applicable 10-year statutory maximum.

This Court reviews *de novo* whether Congress had the power to proscribe Carter's possession of the firearm because the Second Amendment is a jurisdictional issue, *Class v. United States*, 583 U.S. 174, 179  (2018), and "jurisdictional errors are not subject to plain- or harmless-error analysis." *McCoy v. United States*, 266 F.3d 1245, 1249 (11th Cir. 2001). However, *United States v.*

*Dubois*, No. 22-10829, __F.4th__, 2024 WL 927030 (11th Cir. Mar. 5, 2024), forecloses holding that Mr. Carter's offense of conviction violates the Second Amendment either facially or as applied, under the prior panel precedent rule.

**Summary of Argument**

Point One

Mr. Carter is serving an illegal sentence because his four prior convictions of Georgia cocaine offenses do not qualify as "serious drug offenses," for two reasons. First, Georgia's cocaine definition denotes all "stereoisomers," of which conformational isomers are one. At all relevant times, the federal definition has only included "optical and geometric" isomers. According to Mr. Carter's expert, conformational isomers are a common and well-studied form of stereoisomer and conformational isomers of cocaine exist in the real world. A seminal study has specifically measured the energy outputs of various conformational isomers of cocaine (and not just in the realm of scientific theory). Moreover, cocaine is often cut with adulterants, and conformational isomers generally result from adulterants and impurities, making the existence of conformational isomers of cocaine commonplace.

Second, Georgia's cocaine definition includes ioflupane, while the federal definition has not included this substance since 2015. Ioflupane is derived from cocaine via ecgonine and ecgonine occurs naturally in coca leaves. Georgia's definition includes derivatives of coca leaves, so it includes ioflupane. Hence, the state of Georgia warned this Court when it found Florida cocaine was overbroad

13

for including ioflupane that such a holding would also disqualify Georgia cocaine

offenses as "serious drug offenses." This panel is bound to reject this argument as

to Mr. Carter's first three Georgia predicates, all of which occurred before the

federal government excepted ioflupane from its definition, because *Jackson,* 55

F.4th 846, held that the relevant federal definition is the one in effect at the time

of the prior conviction. But the Supreme Court is reviewing *Jackson* and Mr. Carter

maintains that this Court wrongly decided that issue. And the conformational

isomer overbreadth does not depend on the timing. Georgia's definition was

overbroad in this way at the time of Mr. Carter's prior offenses and it remains

overbroad today.

Point Two

Mr. Carter's advisory imprisonment range should be 21 to 27 months based

on a total offense level of 9, because his Georgia cocaine convictions did not qualify

as "controlled substance offenses" and could not therefore trigger the higher base

offense level under U.S.S.G. §2K2.1(a)(2). His arguments are the same as under the

first point heading, with one major difference. This Court held in *Dubois*, 2024 WL

927030, that to qualify as a "controlled substance" within the meaning of

U.S.S.G. §4B1.2(b)(1), the drug involved in a prior offense must be a "controlled

substance" under the law of the jurisdiction that convicted the defendant of that

14

offense. Thus, §4B1.2(b)(1) does not itself disqualify Georgia cocaine offenses. However, Georgia's controlled substance definition, Ga. Code Ann. § 16-13-21, itself requires that a substance be on both the Georgia and federal drug schedules to be considered a "controlled substance." And the Georgia Court of Appeals has affirmed that when a drug only appears on one of the two schedules, it does not qualify under Georgia's "controlled substance" definition. Hence, because Georgia defines cocaine to include conformational isomers and ioflupane, and the federal government does not, then Georgia cocaine does not satisfy Georgia's definition of "controlled substance," and thus does not qualify as a "controlled substance" under §4B1.2(b)(1). On this basis, Mr. Carter's advisory imprisonment range should be 21 – 27 months, instead of 180 – 210 months.

## Point Three

Carter was convicted and is presently serving a sentence for conduct that Congress does not have the power to proscribe under the Second Amendment, as construed in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). His claim is jurisdictional, *Class v. United States*, __U.S.__, 138 S.Ct. 798, 802 (2018), so this Court must review it *de novo*. Sections 922(g)(1) and 924(a)(2) proscribe possessing firearms – conduct that is plainly covered by the Second Amendment's text. Mr. Carter's status as a felon does not disqualify him from the constitutional

phrase "the people." The government cannot meet its burden of showing a distinctly similar, founding-era tradition of barring firearm possession by felons. *Bruen* abrogated *United States v. Rozier*, 598 F.3d 768, 770-71 (11th Cir. 2010). But this panel is bound by *United States v. Dubois*, No. 22-10829, __F.4th__, 2024 WL 927030 (11th Cir. Mar. 5, 2024), which held *Rozier* remains controlling even after *Bruen*.

Point Four

Even if §§ 922(g)(1) and 924(a)(2) could apply constitutionally in some circumstances, these sections violate the Second Amendment as applied to Carter. To the extent that the felon status can be partitioned into subcategories, one of which has stronger historical roots than the overall felon disarmament law, no potentially viable category applies to Carter. The government cannot establish a founding-era tradition of disarming those who deal cocaine, resist arrest, commit traffic offenses, or commit simple assaults and batteries.

**Argument**

Mr. Carter makes various claims below that are the subject of recent or ongoing litigation in this Court and in the United States Supreme Court. At the outset, he acknowledges that prior panel precedent currently forecloses some his arguments. Specifically, *Dubois*, 2024 WL 927030  held that (1) the "controlled substance offense" definition in U.S.S.G. §4B1.2(b)(1) requires that a prior offense involve a "controlled substance" under the law of the jurisdiction that convicted the defendant, and does not require that the state definition match the federal cocaine definition; (2) to qualify as a "controlled substance offense" the relevant definition of cocaine is the one in effect at the time of the prior conviction, not the one at the time of federal sentencing; (3) the offense of being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1) does not violate the Second Amendment; (4) *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) did not abrogate *Rozier*, 598 F.3d at 770-71, which held the same. Moreover, (5) this Court held in *Jackson*, 55 F.4th 846, that to qualify as a "serious drug offense," the relevant definition of cocaine is the one in effect at the time of the prior conviction.

Mr. Carter does not concede any of the above points on the merits. But he must concede that the prior panel precedent rule binds this panel to hold against him on these points, at least for now. Nonetheless, for the reasons below, this

17

Court should find that Georgia cocaine offenses do not qualify as "serious drug offenses" or "controlled substance" offenses even after *Dubois* and *Jackson*.

    I.    THE DISTRICT COURT PLAINLY ERRED BY FINDING THAT CARTER'S TWO GEORGIA COCAINE-RELATED CONVICTIONS QUALIFIED AS "SERIOUS DRUG OFFENSES" WITHIN THE MEANING OF 18 U.S.C. § 922(e)(1), BECAUSE THEY INVOLVED A DEFINITION OF COCAINE THAT IS BROADER THAN THE FEDERAL DEFINITION.

Mr. Carter's statutory imprisonment range increased from 0 – 10 years to 15 years – life based on four Georgia cocaine-related convictions for offenses that occurred from 2005 to 2016. If two or more of these convictions do not qualify as "serious drug offenses," Mr. Carter is serving an illegal sentence that is 90 months over his statutory maximum. A "serious drug offense" is, *inter alia*, "an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substances (as defined in section 102 of the Controlled Substances Act (21 U.S.C. § 802)), for which a maximum term of imprisonment  of ten years or more is prescribed by law[.]" 18 U.S.C. § 924(e)(2)(A)(ii). None of Mr. Carter's Georgia cocaine convictions qualify, for two reasons.

A.  Conformational Isomers

First, at all potentially relevant times, Georgia has defined cocaine to include all of its stereoisomers,[1] while the federal government has defined cocaine to include only its "optical and geometric isomers[.]"[2] Carter submitted the declaration of Professor Neil Garg, Chair of the UCLA Chemistry Department, to explain this overbreadth. R29-2. Because neither definition has changed in this regard, *Jackson*, 55 F.4th 846, does not impact this claim. The relevant federal comparator is the same, whether we use the definition at the time of Mr. Carter's prior convictions, or at the time of his federal sentencing.

An "isomer" is "any of two or more substances that have the same molecular formula but differ in the way their atoms are connected or arranged." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, 450 (5th ed. 2022); *see* R29-2 at 1.  A

---

[1] Georgia defines cocaine as "Cocaine, coca leaves, any salt, compound, derivative, stereoisomers of cocaine, or preparation of coca leaves, and any salt, compound, derivative, stereoisomers of cocaine, or preparation thereof which is chemically equivalent or identical with any of these substances, but not including decocainized coca leaves or extractions which do not contain cocaine or ecgonine." Ga. Code Ann. § 16-13-26(1)(D) (2005) (2012) (2014) (2016) (2024).

[2] 21 U.S.C. § 802(6) defines "controlled substance" as including schedule II substances. Schedule II defines cocaine as including "its salts, optical and geometric isomers, and salts of isomers; ecgonine, its derivatives, their salts, isomers, and salts of isomers, or any compound, mixture, or preparation which contains any quantity of any of the substances referred to in this paragraph." 21 U.S.C. § 812(c) sched. II(a)(4).

"stereoisomer" occurs when two molecules "have the same atomic composition" and "bond connectivity[,]" but "differ in 'the arrangement of their atoms in space.' " *Id*. at 2.

Optical and geometric isomers are types of stereoisomers. The terms are obsolete to chemists, but "optical isomer" corresponds to "enantiomers," and "geometric isomer" corresponds to cis-trans isomerism. R29-2 at 3. "Enantiomers" are "mirror images of each other and non-superposable." *Id*. Cis-trans isomers differ from one another "in the positions of atoms (or groups [of atoms]) relative to a reference plane." "Cis-trans isomer," International Union of Pure and Applied Chemistry Compendium of Chemical Terminology ("Gold Book") (available at: https://goldbook.iupac.org/terms/view/E02069); *see* R29-2 at 3.

Conformational isomers are another type of stereoisomer, where the difference is in the torsion angles between various atoms or groups of atoms. *Id*. at 4; c*f*. "conformational isomerism," Wikipedia, available at: https://en.wikipedia.org/wiki/Conformational_isomerism. They are significant to pharmacology because they relate to "conformational polymorphism," "a well-studied topic in pharmaceutical chemistry" because it impacts drug effectiveness. R29-2 at 4, 6. And they are very common. "The majority of pharmaceuticals are thought to have more than one polymorphic form." *Id*. at 6.

As to cocaine conformational isomers, Professor Garg cited a "seminal study" in which the authors "us[ed] molecular mechanics and semiempirical techniques" to "evaluate[] various conformational isomers of cocaine and stud[y] their relative energies." *Id*. at 5-6 (citing Hugo O. Villar and Gilda H. Loew, *A Conformational Study of Cocaine and Its Diastereomers*, JOURNAL OF COMPUTATIONAL CHEMISTRY, Vol. 11, Iss. 9, pp. 1111-1118 (Oct. 1990)), available at: https://doi.org/10.1002/jcc.540110915 (last visited Mar. 18, 2024). He diagrammed two of the conformational isomers studied. R29-2 at 6. He noted that cocaine often contains "adulterants diluents or impurities," which "can be expected to impact a compound's conformation, leading to conformational isomers." *Id*. at 6-7.

Although the nuance may be difficult for non-chemists to grasp, the takeaway is not. Georgia defines cocaine to include all conformational isomers, while the Controlled Substances Act does not. And conformational isomers of cocaine are not just a theoretical matter. Scientific literature confirms they exist, which is unsurprising since they naturally result from impurities, adulterants, and dilutants. *Cf*. *United States v. Oliver*, 987 F.3d 794, 807 (8th Cir. 2021) (Illinois definition of cocaine including "positional isomers" is overbroad).

Professor Garg is an expert in the field. Although the District Court confessed it did not understand the report, it did not indicate any suspicion of his credentials,

21

or his expert opinion that conformational isomers naturally result from adulterants and impurities. Given that cocaine is commonly "cut" with other substances, the existence of conformational isomers of cocaine follows as a matter of common sense. This is not some giant leap into scientific theory. It is compelling circumstantial evidence that conformational isomers of cocaine exist, in addition to a "seminal study" of actual conformational isomers of cocaine.

The fact that Garg did not himself conduct original research does not make his opinion any less persuasive than the types of expert evidence that courts commonly credit. He did not uncritically point to someone else's work product. He explained, from soup to nuts, what isomers and conformational isomers are, how they come about, and how they would be expected to occur in the context of cocaine, and then pointed to the "seminal" study that corroborates this fact. He is an expert chemist who was retained to offer an expert opinion on the existence of conformational isomers of cocaine – not to prove their existence anew with original research. Garg's declaration easily showed by a preponderance of the evidence that conformational isomers of cocaine exist. Indeed, it showed they are common. Because Georgia's cocaine definition includes them, while the federal definition doe not, Carter's offenses are overbroad and do not count as serious drug offenses.

B. Ioflupane

The four cocaine convictions alleged in Mr. Carter's indictment do not qualify as "serious drug offenses" for an additional reason. By the time of his 2023 federal sentencing, the federal government specifically excluded ioflupane from its definition of cocaine. Georgia, however, has always included ioflupane.

Preliminarily, *Jackson*, 55 F.4th 846, currently forecloses this argument as to all but Mr. Carter's most recent alleged predicate, because it held that, to qualify as a serious drug offense, a state cocaine definition need only match the federal definition at the time of the prior offense (and not at the time of the federal sentencing). Before 2015, when Mr. Carter's first three alleged predicates occurred, both Georgia's definition and the federal definition included ioflupane. On the other hand, Mr. Carter's 2016 Georgia conviction of possessing with intent to sell cocaine does not qualify even after *Jackson*, 55 F.4th 846, because the federal government excepted ioflupane from its definition in 2015. Moreover, this Court will not have the last word on this issue, as the Supreme Court granted certiorari in *Jackson* to review this issue. 143 S.Ct. 2457. Mr. Carter thus maintains that the ioflupane overbreadth disqualifies all of his alleged predicates.

One part of *Jackson* helps Mr. Carter, however. The Court recognized that the federal government's exclusion of "ioflupane" rendered Florida cocaine

overbroad, at least as to predicate offenses occurring after the federal government excluded "ioflupane" but before Florida did. As explained below, Georgia's definition is similarly overbroad, and Georgia has yet to catch up to federal law by excluding ioflupane.

The government below disagreed. It argued that Georgia's definition had never included ioflupane. But both the Georgia and federal definition encompass "derivatives" of cocaine. Again, the federal government defines cocaine as including "its salts, optical and geometric isomers, and salts of isomers; **ecgonine, its derivatives**, their salts, isomers, and salts of isomers, or any compound, mixture, or preparation which contains any quantity of any of the substances referred to in this paragraph." 21 U.S.C. § 812(c) sched. II(a)(4). Under Georgia law, cocaine is "[c]ocaine, coca leaves, any salt, compound, **derivative**, stereoisomers **of cocaine**, or preparation of coca leaves, and any salt, compound, **derivative**, stereoisomers **of cocaine**, or preparation thereof which is chemically equivalent or identical with any of these substances, but not including decocainized coca leaves or extractions which do not contain cocaine or ecgonine." Ga. Code Ann. § 16-13-26(1)(D) (2005) (2012) (2014) (2016) (2024) (bold added.) And

Ioflupane "is derived from cocaine via ecgonine." *Schedules of Controlled Substances: Removal of [123 I] Ioflupane from Schedule II of the Controlled*

*Substances Act*, 80 Fed. Reg. 54715, 54716-17 (Sep. 11, 2015). The Attorney General exercised its discretion to "remove" ioflupane from the drug schedules in 2015, because it can help to diagnose Parkinson's disease. 80 Fed. Reg. at 54716-17. Since then, the federal cocaine definition has excepted ioflupane. 21 C.F.R. § 1308.12.

The Georgia definition of cocaine specifically excludes "extractions which do not contain cocaine or ecgonine." R145 at 2. The implication is that it *does* include extractions that *do* contain ecgonine. Moreover, Georgia's definition encompasses derivatives of "coca leaves." And ecgonine is found naturally in coca leaves. Wikipedia, available at: https://en.wikipedia.org/wiki/Ecgonine (last visited Mar. 17, 2024). Georgia's definition thus includes ioflupane, because ecgonine is a derivative of coca leaves and ioflupane is a derivative of ecgonine.

The state of Georgia agrees that its cocaine definition encompasses ioflupane. After this Court's initial *Jackson* decision found Florida's cocaine offenses were overbroad, *see United Sates v. Jackson*, 36 F.4th 1294 (2022), *vacated by Jackson*, 55 F.4th 856, Georgia warned that this decision would "make numerous state drug convictions disappear for ACCA purposes[,]" including Georgia's. *See* Br. Amici Curiae of Alabama, Florida, and Georgia in support of rehearing, *Jackson*, 2022 WL 2593324 (11th Cir. Jul. 1, 2022). The Solicitor General, as well, has declined

to take the position that Georgia cocaine does not include ioflupane. It responded to a certiorari petition raising the issue by recommending that the Court hold the case pending its review of *Jackson*, 134 S.Ct. 3458 (No. 22-6640), which it need not do if Georgia's definition does not include ioflupane. *Shearry v. United States*, __S.Ct.__, 2023 WL 3194903 (2023) (No. 22-7894) (Aug. 30, 2023).

In sum, Georgia defines cocaine to include derivatives of cocaine, and derivatives of coca leaves that naturally contain ecgonine. It only excepts extractions that *do not* contain ecgonine. Ioflupane is derived from cocaine via ecgonine. Georgia's definition thus includes ioflupane, making it broader than the federal definition. For this reason, Mr. Carter's most recent Georgia cocaine conviction is disqualified under current binding case law. His other Georgia cocaine convictions may be disqualified if the Supreme Court reverses this Court in *Jackson*, 55 F.4th 846. At any rate, all of his convictions are disqualified as "serious drug offenses" because they are predicated on a cocaine definition that includes conformational isomers. He is thus serving an illegal sentence and this Court should vacate his sentence and conviction of violating § 924(e). Because he does not qualify as an armed career criminal, his offense level should not be based on U.S.S.G. §4B1.4(b)(2). Instead, §2K2.1(a)(7) sets his offense level, as argued below.

II.    THE DISTRICT COURT ERRED IN FINDING CARTER'S COCAINE-RELATED CONVICTIONS QUALIFED AS "CONTROLLED SUBSTANCE OFFENSES," BECAUSE TO QUALIFY AS A "CONTROLED SUBSTANCE" UNDER GA. CODE ANN. § 16-13-21, A DRUG MUST APPEAR ON BOTH THE GEORGIA AND FEDERAL CONTROLLED SUBSTANCE SCHEDULES, AND THE GEORGIA SCHEDULE DEFINES COCAINE MORE BROADLY THAN THE FEDERAL SCHEDULE.

The conformational isomer and ioflupane overbreadths also disqualify Mr. Carter's offenses from the "controlled substance offense" definition. Hence, his base offense level could not be based on two prior "controlled substance offenses" as required by U.S.S.G. §2K2.1(a)(2). Instead, his base offense level should be 12 under §2K2.1(a)(7), which would make his total offense level 9, and dramatically lower his advisory imprisonment range to 21 – 27 months.

The relevant statutory texts and scientific taxonomies are the same as above. As well, the timing issue is the same. This Court has now held that the controlling definition of a substance under *both* U.S.S.G. §4B1.2(b)(1) and 18 U.S.C. § 924(e)(2)(A)(ii) is the definition at the time of the prior conviction. *Dubois*, 2024 WL 927030; *Jackson*, 55 F.4th 846. Hence, under current law, this panel is bound to hold that the federal government's exclusion of ioflupane in 2015 does not render Mr. Carter's first three alleged predicates overbroad. Again, it is not

27

similarly bound with respect to conformational isomers, which do not depend on the timing of the relevant cocaine definitions.

Moreover, the rest of the analysis is different. This Court held in *Dubois*, 2024 WL 927030, at *9, that a state controlled substance definition need not match an analogous federal definition to qualify as a controlled substance offense. Hence, under binding precedent there is no occasion to compare Georgia's cocaine definition to the federal definition. Instead, to determine that a predicate offense qualifies as a "controlled substance" within the meaning of §4B1.2(b)(1), this Court must look only to state law. *Dubois,* 2024 WL 927030, would foreclose both Mr. Carter's ioflupane and conformational isomer arguments but for the fact that Georgia's "controlled substance" definition *itself* requires that a substance be included in both the Georgia and the federal drug schedules.

Georgia defines "controlled substance" as "a drug, substance, or immediate precursor in Schedules I through V of Code Sections 16-13-25 through 16-13-29 **and** Schedules I through V of 21 C.F.R. Part 1308." Ga. Code Ann. § 16-13-21(4) (bodl added.) Lest there be any doubt about whether "and" really means "and," the Georgia Court of Appeals has clarified that it does. At issue in C.*W. v. Dep't of Human Services*, 353 Fa. App. 360 (2019), was whether an expectant mother's use of marijuana qualified as "prenatal abuse." Georgia law defines "prenatal abuse"

28

as, *inter alia*, "exposure . . . to any controlled substance, as such term is defined in Code Section 16-13-21, which results in[]" certain consequences. *Id*. (quoting Ga. Code Ann. 15-11-2(56)). The Court of Appeals reviewed Georgia's controlled substance definition, and held "under the plain language of the statute, as C.W. argues, the administrative law judge found, and [the Division of Family and Children Services] concedes – a drug is a 'controlled substance' in OCGA § 16-13-21 only if it is listed as such in both Georgia *and* federal schedules." *Id*. at 361 (italics in original.) Because only the federal schedule included marijuana as such, marijuana did not qualify as a Georgia controlled substance. *Id*.

Again, *Dubois* held "[b]ecause Dubois's underlying conviction was under Georgia law, we consult Georgia law to determine whether the substance that he trafficked is a 'controlled substance' under the guidelines." 2024 WL 927030, at *9. Mr. Carter's underlying convictions were under Georgia law. So Georgia law determines whether they were "controlled substances." But Georgia law requires that a drug be on both the federal and Georgia schedules to be a "controlled substance." This leads us back where we started. A definition of cocaine encompassing conformational isomers and ioflupane is only on Georgia's schedule, and not on the federal schedule. This version of cocaine is not, therefore, a Georgia "controlled substance" within the meaning of Ga. Code Ann. § 16-13-21.

29

Again, Mr. Carter does not concede that state law governs the definition of "controlled substance" within the meaning of §4B1.2(b)(1) – only that *Dubois*, 2024 WL 927030, controls the issue under the prior panel precedent rule. He maintains that federal law controls, but does not belabor the point by detailing his arguments here in this already lengthy brief. At any rate, his convictions are not "controlled substances" under either federal or Georgia law, so his base offense level could not be based on two prior "controlled substance offenses." Without qualifying predicates, his 210-month prison term is ten times the bottom of his applicable Guidelines range.

> III. IN *NEW YORK STATE RIFLE & PISTOL ASS'N, INC. V. BRUEN*, 597 U.S. 1 (2022), THE SUPREME COURT ESTABLISHED A TEST FOR WHETHER A LAW VIOLATES THE SECOND AMENDENT: IF THE TEXT OF THE AMENDMENT COVERS THE CONDUCT THAT THE LAW PROSCRIBES, THE GOVERNMENT MUST SHOW THE LAW IS CONSISTENT WITH DISTINCTLY SIMILAR LAWS OR REGULATIONS THAT WERE COMMONPLACE AROUND THE TIME THE SECOND AMENDMENT WAS ADOPTED. UNDER THIS FRAMEWORK, 18 U.S.C. § 922(g)(1) IS FACIALLY UNCONSTITUTIONAL, AND CARTER'S CONVICTION CANNOT STAND.

In *United State v. Dubois*, No. 22-10829, __F.4th__, 2024 WL 927030 (11th Cir. Mar. 5, 2024), a panel of this Court held in a published decision that the offense of knowingly possessing a firearm after a felony conviction does not violate the

Second Amendment. It reached this conclusion based on the prior panel precedent rule. Prior to *Bruen*, it had rejected a Second Amendment challenge to §§ 922(g)(1) and 924(a)(2) in *United States v. Rozier*, 598 F.3d 768, 770-71 (11th Cir. 2010). At least as of the date this brief is filed, *Dubois* binds this panel both as to the merits of the Second Amendment issue, and to whether *Bruen* abrogated *Rozier*, 598 F.3d at 770-71. Mr. Carter nonetheless maintains that *Dubois* was wrong on both counts, and outlines his arguments below.

The Second Amendment reads "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST., 2D AMEND. Congress permanently barred felons from possessing firearms in 18 U.S.C. §§ 922(g)(1) and 924(a)(2). This offense violates the Second Amendment under the two-part test established in *Bruen*, 597 U.S. 1. A court first must consider whether the challenged law proscribes "conduct" that the plain text of the Second Amendment protects. *Id*. at 2126. If the answer is yes, then the law is presumptively unconstitutional, and the government bears the burden of demonstrating that the law is consistent with the tradition of firearms regulations around the time the Second Amendment was ratified. *Id*. Carter's offense of conviction fails this test, because it contravenes the plain text of the

Second Amendment and is inconsistent with the founding-era tradition of firearms regulations.

A.  Dicta in *Heller* and *Bruen.*

Preliminarily in a number of decisions, courts have seized on several phrases used by the Supreme Court in dicta, to support a conclusion that only "law-abiding citizens" retain their Second Amendment right. *Heller*, 554 U.S. at 635; *see, e.g.*, *United States v. Tribble*, No. 2:22-CR-85, 2023 WL 2455978, at *2 (N.D. Ind. Mar. 10, 2023). The Supreme Court's statements about "law-abiding citizens" and "longstanding prohibitions," which some courts have relied on to hold that convicted felons do not have Second Amendment rights, are dicta, and not a binding part of the holdings in those cases.

First, the *Heller* and *Bruen* Courts had no reason, based on the facts of these cases, to decide how the Second Amendment applied to non-law-abiding citizens. "[T[he criminal histories of the plaintiffs in *Heller*, *McDonald*[*v. City of Chicago*, 561 U.S. 742 (2010)], and *Bruen* were not at issue in those cases." *Range v. Attorney General*, 69 F.4th 96, 101 (3d Cir. 2023).

Second, even if the Court in these cases had more thoroughly outlined how the text-and-history test would apply to such persons, this still would have been dicta. It was unnecessary to determine the rights of non-law-abiding citizens to

32

resolve *Heller* and *Bruen*. In fact, the Court did not have jurisdiction to determine the constitutionality of a statute not implicated by these cases. *United States v. Raines*, 362 U.S. 17, 21 (1960) (Federal courts have 'no jurisdiction to pronounce any statute, either of a state or of the United States void, because irreconcilable with the Constitution, except as it is called upon to adjudge the legal rights of the litigants in actual controversies.")

And finally, the *Heller* Court did not purport to "actually decide" how the Second Amendment applied to non-law-abiding citizens. Michael Abramowicz & Maxwell Stearns, *Defining Dicta*, 57 Stan. L. Rev. 953, 961 (2005). It explicitly declined to pursue "an exhaustive historical analysis . . . of the full scope of the Second Amendment[,]" and left non-law-abiding citizens "to future evaluation[.]" *Heller,* 554 U.S. at 626, 635. Thus, by limiting the question presented to "law-abiding citizens" the Court did not answer questions not presented.

B.  *Bruen* abrogated *Rozier*.

Notwithstanding that *Heller* and *Bruen*'s use of "law-abiding citizens" and "longstanding prohibitions" was clearly dicta, *Rozier*, 598 F.3d at 770-71, undeniably found § 922(g)(1) constitutional when it elevated the *Heller* dicta to Circuit law. But *Bruen* abrogated *Rozier* in two overlapping ways – one methodological, and one substantive.

Methodologically, *Bruen* abrogated *Rozier* by employing a test that *Rozier* clearly did not use, which leads to a different holding than the one *Rozier* reached. Generally, an intervening decision of the Supreme Court must be "clearly on point" to "overrule the decision of a prior panel of [this] court[.]" *Garrett v. University of Alabama at Birmingham Bd. of Trustees*, 344 F.3d 1288, 1292 (11th Cir. 2003). But not every distinction between an intervening decision and prior panel precedent makes that intervening decision not "clearly on point."

This Court has held "where the Supreme Court has clearly set forth a new standard to evaluate" a legal issue, prior Circuit precedent addressing that issue "has been undermined to the point of abrogation and [this Court] is bound to follow th[e] new rule of law." *United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008). This understanding of abrogation was essential to its holding that, by announcing a new standard, *Begay v. United States*, 553 U.S. 137 (2008) had abrogated *United States v. Gilbert*, 138 F.3d 1371 (11th Cir. 1998) on the issue of whether unlawfully carrying a concealed weapon qualified as a U.S.S.G. §4B1.2 crime of violence, even though carrying a concealed weapon was not the predicate offense at issue in *Begay*.

Likewise, *Bruen* abrogated *Rozier* by announcing a new Second Amendment standard that *Rozier* did not apply and that dictates a different result than the one

*Rozier* reached, even though *Bruen* did not involve § 922(g)(1). Prior to *Bruen*, the

Supreme Court "ha[d] not definitively resolved the standard for evaluating Second

Amendment claims." *Silvester v. Becerra*, __U.S.__, 138 S.Ct. 945, 947 (2018)

(Thomas, J., dissenting from cert. denial). *Rozier*, 598 F.3d at 770, sought to fill this

void by asking "whether one is qualified to possess a firearm." It based its test on

the Court's statement in *Heller*: " '[a]ssuming that Heller is not disqualified from

the exercise of Second Amendment rights, the District must permit him to register

his handgun and must issue him a license to carry it in the home.' " *Id*. (quoting

*Heller*, 554 U.S. at 635). It then interpreted the *Heller* statement on "longstanding

prohibitions" as indicating that felons were "disqualified." *Rozier*, 598 F.3d at 771.

　　　　*Bruen*, however, established a different test. It held:

> When the Second Amendment's plain text covers an
> individual's conduct, the Constitution presumptively
> protects that conduct. The government must then justify
> its regulation by demonstrating that it is consistent with
> the Nation's historical tradition of firearm regulation.
> Only then may a court conclude that the individual's
> conduct falls outside the Second Amendment's
> "unqualified command."

*Id*. at 2129-2130 (citation omitted.) In creating a new test, which, as argued below,

dictates a different result than the one reached in *Rozier*, *Bruen* "undermined"

*Rozier* "to the point of abrogation . . . ." *Archer*, 531 F.3d at 1352; *cf. United States*

*v. Files*, 63 F.4th 920, 928 (11th Cir. 2023) (although a legal test may not always be strictly necessary to the holding, "no one thinks that when we do state a governing rule – as we typically do – we do so gratuitously and unnecessarily.")

Substantively, some claim that *Bruen* only overruled the means-ends balancing step that most courts employed. *See, e.g*, Gov't Br., *United States v. Deonta Lowe*, No. 22-13251, 40-41[3] (11th Cir. Apr. 6, 2023). Accordingly, the argument goes, *Bruen* could not have abrogated *Rozier*, since *Rozier* did not balance the ends and means to reach its result.

It is true, *Bruen* began its analysis by outlining how the courts of appeal "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny[,]" and then rejecting the means-end balancing step as "one step too many." *Bruen*, 142 S.Ct. at 597 U.S. at 17-19. If *Bruen*'s analysis had ended there, it may be correct to conclude that it did not abrogate *Rozier*.

But *Bruen*'s holding was not so limited. *Bruen* did not simply strike down means-end scrutiny, and leave to the lower courts the task of formulating a new test. It affirmatively established the test to be used: (1) does "the Second

---

[3] Carter cites to the blue page numbers generated by Pacer and appearing at the top of the page.

Amendment's plain text cover[] an individuals conduct[?]"; and, if so, (2) can the government show the regulation "is consistent with the Nation's historical tradition of firearm regulation[?]" *Id*. at 2129-2130 (citation omitted.)

*Rozier* read into *Heller* an additional step that asks "whether one is qualified to possess a firearm." 598 F.3d at 770. But under *Bruen*, the *only* two bases for determining that persons are "disqualified," *Rozier*, 598 F.3d at 771, from firearm possession are either the plain text of the Second Amendment or the traditional, founding-era firearms regulations.

*Rozier*'s "disqualification" test was not, and did not purport to be, either a textual analysis of whether felons are among "the people," or an historical analysis of whether they were traditionally barred from firearm possession. Instead, this Court determined that "Rozier's Second Amendment right to bear arms is not weighed in the same manner as that of a law-abiding citizen[,]" pointed to the dicta in *Heller*, and found § 922(g)(1) constitutional. *Rozier*, 598 F.3d at 771. Because *Rozier* found § 922(g)(1) constitutional based on a carveout of non-law-abiding citizens that did not accord with **either** step of the *Bruen* test, *Bruen* abrogated *Rozier*.

    C. The plain text of the Second Amendment covers the conduct proscribed by 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

*Bruen*, 597 U.S. at 17, held "that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." Carter is imprisoned for possessing a pistol – the conduct proscribed by 18 U.S.C. § 922(g)(1). *See* R43 (presentence investigation report ("PSR")) at ¶10. The question, therefore, is whether the plain text of the Second Amendment covers possessing firearms.

**"To Keep and Bear."** *Bruen*, 597 U.S. at 59-60, clarified that "to keep and bear" arms includes carrying a firearm outside of the home. Carter possessed a firearm in his vehicle. R43 at ¶10.

**"Arms."** "Arms" include "weapons of offense or armour of defense." *Heller*, 554 U.S. at 581. This includes firearms like Carter's, which existed when the Second Amendment passed. *See* "pistol," Wikipedia, https://en.wikipedia.org/wiki/Pistol (last visited Jan. 19, 2024) ("The word 'pistol' is derived from the Middle French pistolet (c. 1550), meaning a small gun or knife, and first appeared in the English language c. 1570 when early handguns were produced in Europe.")

**"The people."** A plain reading of the constitutional phrase "the people" does not purport to exclude felons. Founding-era dictionaries defined "people" to encompass the entire political community. *See* Thomas Dyche & William Pardon, A NEW GENERAL ENGLISH DICTIONARY (14th ed. 1771) ("signifies every person, or the

whole collection of inhabitants in a nation or kingdom."); Noah Webster, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) ("the body of persons who compose a community, town, city or nation.")

In *Heller*, 554 U.S. at 580-81, the Supreme Court entertained a "strong presumption" that this text refers "to all members of the political community, not an unspecified subset[,]" which is the "unambiguous[]" meaning of the term in "all six other provisions of the Constitution that mention 'the people[.]' " Significantly, *Heller* did not say, as the government has argued elsewhere that "all members of the political community" means, or is otherwise coextensive with, only those who possess the right to vote or serve on a jury, which are collective rights, not individual rights. *See, e.g*., Gov't Br., *Lowe*, No. 22-13251, at 42-49. Quite the opposite. *Heller* held that, as used in the Second Amendment, "the people" includes "all Americans" and everyone who is "part of [the] national community." *Id*. at 580-81. And *Bruen* reaffirmed that "all Americans" enjoy Second Amendment rights. 142 S. Ct. at 2156.

The distinction between individual rights (like the right to bear arms) and collective powers (like voting) was the crux of *Heller*'s holding that the arms right is not limited to militia service. *Heller* held that the right to bear arms is an individual right, unconnected to a collective, civic enterprise like militia service. *See State v.*

*Roundtree*, 952 N.W.2d 765, 787 (Wis. 2021) (Bradley, J., dissenting) (explaining that reliance on "collective" rights such as voting "is entirely misplaced in construing the Second Amendment," which codifies an "individual right[]"). Therefore, the government's power to disenfranchise certain categories of people does not imply a power to disarm them.

> D. Barring all felons from possessing firearms is inconsistent with the relevant historical tradition of firearms regulations.

Because the plain text of the Second Amendment contravenes § 922(g)(1), the government bears the burden of demonstrating that § 922(g)(1) is consistent with the historical tradition of firearms regulations in this country. *Bruen* made three points clear about what the government must show: (1) the extent to which those laws must resemble § 922(g)(1) depends on the novelty of the problem § 922(g)(1) is designed to address; (2) the laws relevant to a federal regulation are those that existed around the time the Second Amendment was ratified in 1791; and (3) several outlier laws do not establish a "tradition." The history adduced thus far in support of the constitutionality of § 922(g)(1) in cases around the country fails to meet each of these requirements.

What the government must show to satisfy its burden depends on whether the challenged regulation addresses a new societal problem, or a societal problem that

the founding generation would have understood. *Id*. at 2131-2133. "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a *distinctly* similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26 (italics added). Similarly, "if earlier generations addressed the societal problem through *materially different means*, that also could be evidence that a modern regulation is unconstitutional." *Id*. (italics added.) But laws "implicating unprecedent societal concerns or dramatic technological changes may require a more nuanced approach." *Id*. at 2132. Such unprecedented concerns do not require such a "distinct[] similar[ity]," as long as "the two regulations are 'relevantly similar.' " *Id*. at 2131, 2133 (citation omitted.) In sum, laws addressing an age-old societal problem require closer historical analogues than those addressing a novel, modern one. *Id*.

Felon disarmament is a modern response to an ancient problem. The potential dangerousness of felons was known to the founders. Before the Revolution, many colonies were heavily populated with convicts exported there by England. Encyclopedia of Virginia, *Convict Labor During the Colonial Period*, available at: https://encyclopediavirginia.org/entries/convict-labor-during-the-colonial-period/ (last visited August 15, 2023) (noting that, as of 1776, Virginia

41

alone housed at least 20,000 British convicts). Benjamin Franklin once wrote a satirical article proposing that the colonies send rattlesnakes to England in return for the thousands of convicts England was re-settling in the colonies. *See* Bob Ruppert, "The Rattlesnake Tells the Story," Journal of the American Revolution (Jan. 2015).

Hence, the government must prove a "distinctly similar" tradition of firearms regulations. *Bruen*, 597 U.S. at 26. When used in an adjectival phrase, "distinctly" means "in a way clear to the mind or perception; clearly, unmistakably, decidedly, indubitably." Oxford Eng. Dict, Available at: https://www.oed.com/view/Entry/55681?redirectedFrom=distinctly#eid (last viewed Aug. 25, 2023). A vague similarity or rough analogy between § 922(g)(1) and some other tradition of firearms regulations is not similar enough to conclude that § 922(g)(1) passes muster under the Second Amendment.

This is significant because it has been argued that the government could meet its burden based on laws barring firearms from different subsets of people – such as slaves, Native Americans, Catholics, persons who supported an outspoken preacher in the 1630s, those who spoke ill of an act of the Continental Congress, those who had been insufficiently supportive of the Revolution, and persons, such as Quakers, who refused to take a loyalty oath. *Cf*. Gov't Br., *Lowe*, 22-13251, *supra*

at 50-56. The argument was that these laws are relevantly similar to § 922(g)(1) because they were all premised on a similar belief that the disarmed groups could not be trusted to abide by the law. *Id*.

Implicit in this comparison is that these historical analogues, as well as § 922(g)(1) "address[] a general societal problem that has persisted since the 18th century." *Bruen*, 597 U.S. at 26. Indeed, there is nothing new in the concern about untrustworthy persons possessing firearms. But this fact means that "[t]he lack of a *distinctly* similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id*. (italics added.) With such an age-old problem, a vague similarity cannot suffice. On the other hand, even if these disarmament examples were taken to be more than outliers, they show that the English and early American authorities addressed the problem of untrustworthy persons "through materially different means" – disarming groups based on their race, religion, or political loyalties. *Bruen*, 597 U.S. at 26.

Certainly, the similarity cannot be at such an abstract level that it could apply to virtually any law. But that is the level at which the history of disarming distinctly different groups relates to felon disarmament. If this abstraction is enough to provide constitutional cover to § 922(g)(1), it is difficult to conceive of any limit to

43

who a legislature could not disarm. Particularly in times of social upheaval, one can imagine all kinds of nefarious laws directed at various disfavored groups. If perceived untrustworthiness, unvirtuousness, or some other abstract characteristic, is all that is required, then the Second Amendment stands down whenever any majority of a given legislature, or some other rule-making body or person, labels a disfavored group with such a characteristic. *Cf. Rahimi*, 61 F.4th at 453 ("[T]he Government's argument reads the Supreme Court's 'law-abiding' gloss so expansively that it risks swallowing the text of the amendment.")

Indeed, if the only throughline connecting modern felon disarmament laws to the smattering of disarmament laws over the course of four centuries is the fact that some authority found these groups to be untrustworthy, this would justify even the New York special justification law struck down in *Bruen*. This law undoubtedly stemmed from the implicit belief that those without a special justification could not be trusted with firearms. In this way, failing to require a more meaningful connection between a challenged law and the historical consensus would replicate the type of subjective means-end analysis that *Bruen* struck down, albeit under a less candid framework whereby lawyers and judges find in the history whatever they are looking for, by simply abstracting to the needed level of generality.

44

i. The vast majority of the government's precedents did not exist around the time the Second Amendment was ratified, which disqualifies them under *Bruen*.

"[N]ot all history is created equal." *Bruen*, 597 U.S. at 34. The history is only relevant to the extent it enlightens the public understanding of the Second Amendment around the time it was ratified. *Id*; *Heller*, 554 U.S. at 634–635. *Heller* considered "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century[.]" 554 U.S. at 605. *Bruen* discussed the relevant time frame in more detail. The closer to the time the Second Amendment was ratified, the more force it has. It explained " '[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them.' " 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634–635).

*Bruen* thus distinguished between ancient practices that " 'prevailed up to the 'period immediately before and after the framing of the Constitution[]' " and those "that had become 'obsolete in England at the time of the adoption of the Constitution' and never '[were] acted upon or accepted in the colonies.' " 597 U.S at 35 (citations omitted.) It likewise instructed courts to "guard against giving postenactment history more weight than it can rightly bear." *Id*. Both decisions specifically discounted "post-Civil War discussions of the right to keep and bear arms" which " 'took place 75 years after the ratification of the Second

45

Amendment,' " and therefore " 'do not provide as much insight into its original meaning as earlier sources." *Bruen*, 597 U.S. at 36 (quoting *Heller*, 554 U.S. at 614); *cf. Sprint Communications Co.*, *L.P. v. APCC Services, Inc.*, 554 U.S. 269, 312 (2008) (Roberts, C. J., dissenting) ("The belated innovations of the mid- to late- 19th-century courts come too late to provide insight into the meaning of [the Constitution in 1787]")

Federally, Congress enacted the precursor to 18 U.S.C. § 922(g) in 1938, which only applied to certain felons. *United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011). It expanded the proscribed category to all felons in 1961. *Id*. And it changed the operative verb from "receive" to "possess" in 1968. *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010).[4]

Thus, § 922(g) itself, enacted 150 years after ratification, came far too late to conclude that felon disarmament was consistent with the founding generation's understanding of the scope of the Second Amendment's protections. *Bruen*

---

[4] Moreover, even if the government uncovered a wealth of historical sources that the scholars have missed, establishing a founding-era tradition of barring felons from possessing firearms, it is worth noting that the category of offenses deemed felonies has drastically expanded since that time, calling into question whether the modern conception of "felon" accurately reflects the actual historical tradition. *See, e.g., Folajtar v. Attorney General*, 980 F.3d 897, 904 (3rd Cir. 2020) ("A felony unquestionably encompasses a broader array of crimes today than it did in 1791.")

explained what to do with more recent precedents: "to the extent *later* history contradicts what the text says, the text controls." *Id*. at 2137 (italics added.)

      ii.    A handful of distinctly similar laws would not establish an historical "tradition" according to *Bruen*.

The government must show an historical "tradition" of analogous firearms regulations. *Bruen*, 597 U.S. at 17. A few outliers will not do. The Court "doubt[e]d that three colonial regulations could suffice to show a tradition of public-carry regulation." *Id*. at 46; *see also Heller*, 554 U.S. at 632 (declining to "stake our interpretation of the Second Amendment upon a single law, in effect in a single city, that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms for defense of the home.")

With respect to felon disarmament laws, the relevant consensus simply does not exist. After thoroughly combing the historical record, the scholarly consensus is that the historical record does not reveal *any* laws on the books proscribing the possession of firearms by felons until the 20th Century. As one historian wrote, after he searched all existing printed session laws of the first fourteen states year by year from 1607 to 1815, he couldn't find 'a single instance in which these jurisdictions exercised a police power to prohibit gun ownership by members of the body politic.' " *United States v. Quiroz*, 629 F.Supp.2d 3d 511, 519 (W.D. Tex. 2022)

(quoting Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*: The Legal Context of the Second Amendment, 25 L. & HIST. REV. 139, 157 (2007)). Moreover, "it wasn't until 1886 that a state court ruled on a firearm regulation that regulated 'the condition of a person—rather than directly regulating his manner of carrying.' " *Id*. at 520 (quoting C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?,* 32 HARV. J. L. & PUB. POL'Y 695, 711 (2009)); *see also Kanter*, 919 F.3d at 458 (Barrett, J., dissenting) (after reviewing historical record, concluding that no "historical practice supports a legislative power to categorically disarm felons because of their status as felons."); Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L. J. 1371, 1374 (2009).

*Bruen*, 597 U.S. at 38, concluded:

> [a]part from a handful of late-19th-century jurisdictions, the historical record compiled by respondents does not demonstrate a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense. Nor is there any such historical tradition limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense.

Similarly, notwithstanding laws disarming various groups of people, most commonly slaves, starting in the 17th century, there is no historical evidence of felon disarmament laws until the 20th century. Just as New York could not establish

an historical tradition justifying its special circumstances licensing regime in *Bruen*, the government cannot "demonstrate a tradition of broadly prohibiting" felons, or non-law-abiding persons generally, from bearing arms. *Id*.

> iii. The Second Amendment and its predecessor in the Declaration of Rights of Man were adopted precisely to counter categorical disarmament laws.

Far from justifying § 922(g)(1), the categorical disarming of unpopular groups led directly to the right to bear arms. In England, the people became heavily armed during their 17th Century civil wars. David E. Vandercoy, *The History of the Second Amendment*, 28 Val. U. L. Rev. 1007, 1015 (1994). After the Restoration of the monarchy, King Charles II began to disarm "disaffected persons" with the Militia Act of 1661. *Id*. at 1016. With the Game Act of 1671, he dramatically limited the right to hunt and barred possessing firearms by non-hunters. *Id*. King James II continued the disarmament policy, amassed a standing army, and replaced Protestants with Catholics at high government posts. *Id*. at 1016-1017. This culminated in the Glorious Revolution, when James II fled upon Prince William III landing in England with an army. *Id*. at 1017. A special parliament crowned William and Mary as co-sovereigns and adopted the Declaration of Rights of 1689. *Id*. An early draft of the Declaration of Rights recited the abuses of James II, including his disarming of Protestant subjects. *Id*. at 1018. The final version set forth the positive

49

right of Protestant subjects to have arms for their defense, and "as allowed by law" – a phrase referring to how arms were used, not as a limitation on possession. *Id.*; *see* 1 W. & M., Sess. 2, ch. 2 (1689).

Similarly, in the run-up to the Revolutionary War, King George III "began to disarm inhabitants of the most rebellious areas[]" of the Colonies. *Heller,* 554 U.S. at 594. Given this history, "by the time of the founding," the right to bear arms was "understood to be an individual right protecting against both public and private violence." *Id.* It was designed to safeguard "the people" from such categorical disarmaments.

This Court should not accept any invitation to rely on laws of the same sort as those that led to the Second Amendment, and to its precursor in the English Declaration of Rights, to demonstrate that such laws are consistent with the historical tradition surrounding the Second Amendment. Such a rationale turns the Second Amendment on its head. It would permit disarming some politically unpopular subsets of "the people" who may need the Second Amendment's protections the most, during the times they might be at most risk from an oppressive government or an unruly mob. This Court should reject any argument that the disarmament of various disfavored categories of people in Anglo-American legal history constitutionalizes § 922(g)(1). The Second Amendment does not

permit disarming a group of people based only on the fact that someone, or some legislature, at some point, decided to disarm an entirely different category of people, based on that group's perceived untrustworthiness or lack of virtue. It was designed precisely to prevent such laws.

>    iv. Unratified drafts of the Second Amendment suggest that the Framers *rejected* those limitations on the Second Amendment.

Some have pointed to several drafts of the Second Amendment floated during the ratifying conventions, which would have explicitly permit certain disarmament laws. *Bullock*, 2023 WL 4232309, at *49. Needless to say, this language was not ratified. The fact that a draft or provision was left on the cutting room floor implies that the final version of the law purposefully did not include this provision. And even if they had the force of law, a few drafts do not establish a custom. *Cf. Bruen*, 142 S.Ct. at 46. Finally, none of these drafts would have categorically disarmed felons.

In sum, the government cannot come close to meeting its burden. The only possible precedents for felon disarmament are a smattering of laws in England and the United States, of which only a handful existed in the relevant time frame. These laws bear only a vague resemblance to 18 U.S.C. § 922(g)(1), in that they disarm various groups (but not felons) based on perceived untrustworthiness. And instead

of complementing the Second Amendment, such disarmament laws are what prompted the adoption of the Second Amendment and its English predecessor. This Court must, therefore, hold that § 922(g)(1) violates the Second Amendment.

> ### IV. EVEN IF § 922(g)(1) CAN CONSTITUTIONALLY APPLY UNDER SOME CIRCUMSTANCES, IT IS UNCONSTITUTIONAL AS APPLIED TO CARTER.

Neither *Dubois* nor *Rozier* foreclosed as applied challenges to § 922(g)(1) and 924(a)(2) under the Second Amendment. Thus, these cases do not bind this panel on this point.

The offense of knowingly possessing a firearm after a felony conviction is unconstitutional as applied to Carter. The elements of his offense are "(1) a status element[,]" in his case, being a convicted felon, "(2) a possession element (to 'possess'); (3) a jurisdictional element ('in or affecting commerce'); . . . (4) a firearm element (a 'firearm or ammunition')[;]" *Rehaif v. United States*, ___U.S.___, 139 S.Ct. 2191, 2196 (2019) (quoting 18 U.S.C. § 922(g)), and (5) a "knowingly" *mens rea* extending to both the relevant status and to the possession. 18 U.S.C. § 924(a)(2); *Rehaif*, 139 S.Ct. at 2200.

These were the elements he assented to in pleading guilty. R61 (change of plea transcript at 7:24 – 8:4). He made no admission to any other status, or characterization of him. He stipulated to his felony status, not some other

hypothetical element. His conviction was based on his status as a felon, and there was no tradition around the time the Second Amendment was passed of barring persons with this status from possessing firearms. Section 922(g)(1) is therefore unconstitutional as applied to him.

Setting aside an elemental approach to the question, and instead entertaining a more nuanced approach based on the nature of Carter's criminal record, there is no historical tradition justifying barring firearm possession by persons with a criminal history like Carter's. There is no historical tradition barring firearm possession by misdemeanants, or those convicted of theft, possessing drugs or paraphernalia, obstructing an officer, or giving an officer a false name, or any other category one could define based on these convictions. For this reason, §§ 922(g)(1) and 924(a)(2) are unconstitutional as applied to Carter. *Range*, 69 F.4th at 106 (finding § 922(g)(1) unconstitutional as applied to possession of rifle and shotgun); *United States v. Quailes*, No. 1:21-CR-00176, __F.Supp.3d__, 2023 WL 5401733 (M.D. Pa. Aug. 22, 2023) (section 922(g)(1) unconstitutional as applied to defendant with four recent drug trafficking convictions).

**Conclusion**

For the foregoing reasons, this Court should reverse and vacate Carter's conviction and sentence and order his immediate release. If it disagrees with his Second Amendment issues, it should still vacate his sentence and remand for resentencing based on the claims made in his first two point headings.

Dated this 18th day of March, 2024.

*s /Jonathan R. Dodson*
JONATHAN R. DODSON
FL Bar Number: 0050177
Assistant Federal Defender

Federal Defenders of the
Middle District of Georgia, Inc.
440 Martin Luther King, Jr. Boulevard, Suite 400
Macon, Georgia 31201
Tel: (478) 743-4747
Fax: (478) 207-3419
E-mail: jonathan_dodson@fd.org

**Certificate of Compliance**

Pursuant to Fed. R. App. P. 32(a)(7)(C), I, Jonathan Dodson, appellate counsel for Carter, hereby certify that the number of words in this brief, as counted by the Microsoft Office Word processing system, according to the method described in 11th Cir. R. 32-4, is **11,430** words; which is less than the 13,000 allowed for appellate initial briefs by Fed. R. App. P. 32(a)(7)(B)(i).

**Certificate of Service**

I, Jonathan Dodson, appellate counsel of record for the Appellant, Carter, hereby certify that I have, on this 18th day of March, 2024, filed the foregoing *Appellant's Initial Brief* with the Clerk of Court using the Eleventh Circuit's CM/ECF system, which will send electronic notification of filing to counsel of record. I also certify that I caused a copy of the foregoing *Appellant's Initial Brief* to be served in paper format to Carter by placing a copy of the same in the United States Mail, postage prepaid, addressed to: Emory Austin Carter, GDC ID 0001127239, Rogers State Prison, 1978 Georgia Highway 147, Reidsville, Georgia 30453. I further certify that I caused the foregoing submission to be dispatched for filing with the Clerk of Court by Federal Express overnight delivery.

*s/ Jonathan Dodson*

JONATHAN R. DODSON
FL Bar Number: 0050177
Assistant Federal Defender

Federal Defenders of the
Middle District of Georgia, Inc.
440 Martin Luther King, Jr. Boulevard, Suite 400
Macon, Georgia 31201
Tel: (478) 743-4747
Fax: (478) 207-3419
E-mail: jonathan_dodson@fd.org